This case is yet another ineffective assistance counsel case, but bringing us back to the Sixth Amendment in a criminal case. And there's no real disagreement between the respondents and the prosecutor in this case and Mr. Scattebo that the night that he killed Mr. Tao, that he acted unreasonably. And what the court needs to look at, or what we look at, if you look at any version of the facts, Mr. Scattebo's, the various witnesses, and there was a great deal of conflicting versions on the details of what the incident took place. If there's no way, if any version demonstrated that Mr. Scattebo acted in a way that a reasonable person would not act, that it was unreasonable for Mr. Schweitzer, the defense attorney, to pursue a heat of passion defense to get to manslaughter. The one thing that was consistent between the June and November trials was that the defense theory was manslaughter. And what that required was for the defense to negate malice. And they managed that in the first trial. It's not clear whether they managed that in the first trial. The first trial in June resulted in an acquittal of first degree. And as we well know, the difference between first and second, which was the hung count, has to do with premeditation and deliberations. So malice was the hitching, the kick that the jurors were greatly split about. So we also know from the first trial that there was a fair amount, almost 12 hours of deliberations over a number of days. And we contrast that, because what I really want to kind of more focus on, the briefs did, I think, an adequate job of talking about performance, but I want to focus more on prejudice. At the second trial, we have deliberations of about an hour and a half. We have the most compelling witnesses, both Mr. Scadabo and Mr. Biggs, the six-foot-seven person who was part of the original dispute that Mr. Scadabo went over to investigate, and who provided conflicting evidence about the position of the various people, whether they were actual combatants or whether they were just mouthing young men, with Cathy Anton. His testimony is just presented through a reading of his first trial testimony. His physical presence isn't there. And what the district court did through, you know, essentially adopting the Respondent's arguments, was to assume all sorts of tactical reasons for that. But the reality is, if you take a look at what the state of mind, and that's the only thing that was at issue, was what was Mr. Scadabo's state of mind at the time that he whacked Mr. Tao in the head and ultimately killed him, he died a few days later, was it goes directly to malice. And malice, as we know, what he needed to negate, what he really had to focus on, was to explain what was that thinking and whether it was rational or whether it was reasonable. Can I ask a question, just to step back a little? Sure. Is your contention, and this may have to do with the way the COAs were granted, that the, that what was, what the attorney's IAC was, was misadvising him as to whether to take the stand? Or are you arguing that he was deprived of his individual right to decide whether to take the stand because he wasn't advised that he could take the stand or whatever? I mean, I don't understand his declaration to have said that. He didn't say, I didn't know I could insist on taking the stand. No, he didn't. But I was confused as to what world we were in. Were we in the world of he knew he could have taken the stand, but he was misadvised? Or are we in the world of he, the IAC is that the lawyer didn't tell him he could take the stand no matter what the lawyer said? I think we're in the latter. I mean, certainly it's a pro se petition, so it's not always completely clear. It's easy to read because it's typed, thankfully. But where I would disagree, and this is a little bit different than the question you're asking, where I would disagree with the district court's characterization of the claim, because at page 10 of the findings and recommendations, it's 19 in the excerpts, is the magistrate drops a footnote saying that the choice to pursue the defense is not alleged as an IAC claim. And I think that characterization is inaccurate. And the choice what? The choice of whether to pursue an imperfect self-defense versus at a heat of passion is not. But that's not the question. It is different. I don't the petition is alleged in ineffective assistance of the counsel claim grounds. But which ineffective assistance of counsel? Well, I think if you take a look at the petition, there's a number of things. It's not a direct, it's not as clear as I would like, but it's not, it doesn't directly allege that, for example, at excerpts of record 53, this is the Federal petition. Which one, I'm sorry? Excerpts of record 53. Where is it in the petition? Just tell me what the second part is. I'm sorry. Where in the petition? Yeah. Grounds. The petition is not terrifically well paginated. In the excerpts of record, it's on page 53. It's the ninth page of the Memorandum of Appointment of Authorities. And it's the next few pages that actually set out most of it. In the one, two, three, four, fifth paragraph, the petition alleges there can be no tactical reason to keep the jury in the dark as to the actual defendant's state of mind leading up to the act of murder or of manslaughter, which was the actual crime committed. And then on page 13, a few pages later, excerpt of record 57. Where it is on the page? I have it in my notes. Here, appointed counsel advised petitioner he didn't want him to testify because he was focusing on heat of passion, but yet the jury was not allowed to actually hear from the defendant regarding his state of mind, which was one of fear for his own safety. Counsel's advice not to testify was incompetent advice, given the circumstances of the case. This was highly prejudicial to petitioner. So it seems to me you're on world one, i.e., the complaint is about the advice, not about that he didn't understand that he could have himself insisted on taking the stand no matter what. Right. I think that, yeah. If we actually had factual development talk to Mr. Counsel, we may have a different, that's my only hesitation. I've talked to him, but that aspect of it isn't. In terms of what's been presented so far, it's in that realm. As far as what is exhausted and what's presented. The only other aspect that I would point to, and this is on page, excerpt of record 61, is that he said the jury, he alleged the jury would never know his reasoning for feeling like he had no choice but to fend off those who felt, he felt were going to assault him, and that's what, that was acting out of fear and anger. And that, those kind of allegations, factual allegations segue back to what my comment about the magistrate judges and the district court ultimately, their footnote about parsing out that this isn't an effective assistance to counsel claim about choice of defense, when really that is part and parcel of it. So that the way that the magistrate and district court judge focused on this case, they said this is a heat of passion defense, the way you present that is to show the anger of the situation, the quarrel, and they left it at that. And they said that came in adequately through Mr. Counsel. And it came in perfectly, and it was an answer to Mr. Scadabo's statement to the police, which was offered as an exhibit. But isn't that the reason, isn't this just a classic tactical decision by a lawyer who had an unusual amount of information, because he'd been through the first trial, and what he knew about the first trial was that the jury seemed impressed with the heat of passion and not with the imperfect self- defense, at least some of them. At least some of them. Right.  If there was no difference in the state of mind between heat of passion and an imperfect self-defense, I'd lose, for that very reason. And the problem has to do with both, and this goes back more to the reasonablest prong of his performance. The big difference between heat of passion and unreasonable self-defense is the standard that a reasonable person has to fear that defense, or a reasonable person has to have reacted in a heat of passion. And we've got all this evidence, and Mr. Schweitzer had all this evidence from the first trial that showed that Mr. Scadabaugh was not standing in the shoes, he wasn't in any shoes at all, of a reasonable person. Here's someone who the evidence suggests, even his own evidence, that he either is still under the influence of methamphetamine or is just coming off of it. He's been up for three days. He goes out to investigate a disturbance in his boxer shorts and nothing else. Doesn't bring anyone with him, doesn't ask anyone to assist. And when he's confronted by these three men, a 6'7", 6'6", and someone else who's stockier, but it's not clear how tall, he gets very confrontational. Now, there's no evidence in what was presented through just his statement, which is a very ambiguous statement, about the reasonableness of that reaction or, indeed, the accuracy of whether he was angry or fearful, because it goes both ways. And I would ask you, I'm going to reserve 15 seconds, I would ask you to look at the statement, and it's in the clerk's transcripts. And there are at least four or five places where it fits more into unreasonable self-defense, or imperfect self-defense. I have a couple of questions, just to make sure that I'm understanding your position. First of all, we're not saying that he was deprived of taking a stand where he wanted to take it and demanded it. We're talking about whether it was in his defense or not. And second of all, we're talking about whether it was ineffective for the counsel not to have put him on the stand. Right. I mean, his factual statement is that he wanted to testify. He has not alleged an independent Sixth Amendment right to testify. We're talking about ineffectiveness in not putting him on. So they did put on the interview with the police, which discussed a lot of this. And isn't that a tactical? Excuse me. I'm sorry. Isn't that a tactical decision as to what would be best, rather than subjecting Scalabro to cross-examination, not his prior criminal record, et cetera, to just put that on there, rather than have Scalabro take the stand and be available to all kinds of cross-examination? That is a classic tactical decision.  Scalabro was not subject to cross-examination. And my argument from a prejudice point of view is that when you look at that statement, that it is inherently an ambiguous statement, giving conflict, it's a very leaded, the detective has taken a very leading role in making that statement, and it's very controlled, so that you don't have a full explanation from Scalabro, unlike what you had at the  And I think that's a very important point. And I think if you compare his testimony from the first trial with the statement that you would come to the conclusion, both that it was prejudicial not to put him on, and that it was an unreasonable tactical decision, if it was one. Thank you. I'll give you a minute for rebuttal. Thank you. Good morning. May it please the Court. Daniel Bernstein, Deputy Attorney General, appearing on behalf of the Respondent. Defense counsel in this case had a rare opportunity to evaluate Mr. Scalabro's performance as a witness and its effect on the jury before making a decision as to whether he wanted to call him as a defense witness in the retrial. Mr. Scalabro had testified largely along the lines of self-defense or imperfect self-defense. And then the jury acquitted him on first-degree murder, finding there was no intent to kill. But the jury hung on second-degree murder. And there was a very telling note that the jury provided during the deliberations. The jury issued a note saying that we are split. We are divided. Some of us conclude that the defendant acted out of anger with implied malice. And some of us conclude that the defendant acted in a heat of passion in a provoked response. Mr. Scalabro's attorney apparently took that message to heart in the retrial. He realized that the theory that seemed to be resonating with the jury was a theory of heat of passion. He was not going to put him on the witness stand to argue for manslaughter, not self-defense or imperfect self-defense. And based on that experience in the first trial, he made what Judge Berzon referred to as a classic tactical decision. He decided he was not going to put Mr. Scalabro on the witness stand in the retrial. He was going to just make his case based on cross-examining the prosecution witnesses and emphasizing the evidence from the tape-recorded statement that Mr. Scalabro gave that was introduced in the retrial, which had evidence that this was a fight or a loud argument that Mr. Scalabro was reacting to some harsh words and provocation and taunting that was made. And he was going to argue exclusively a theory of heat of passion. And it turned out that the jury convicted him. They found that he acted with implied malice. They did not find that he acted in a heat of passion. But nevertheless, the tactical decision was made. The tactical decision was reasonable. And we can't, under Strickland it's very clear what we should and should not do in evaluating defense counsel's tactical decisions. We should not go back in hindsight and say what he should have done based on the outcome. We should say based on the facts that he had and the cards that he was dealt with, was his decision to proceed in such a fashion without calling Mr. Scalabro in the retrial reasonable. And we submit that it was eminently reasonable based on what he had learned in the first trial. In addition to the reasonableness of counsel's decision, Mr. Scalabro also is unable to demonstrate prejudice for purposes of Strickland. He cannot show that had he testified consistent with what he says in his declaration that he would have had a better chance of being convicted of manslaughter rather than second-degree murder. Because his declaration says that if I had testified that I would have ‑‑ sorry, I don't have it directly in front of me, but I think it's something along the lines of if I had testified, I would have said that I was afraid that I was going to be jumped on by three men and I acted out of fear and not anger. Well, the prosecution in both the first trial and in the retrial put on several eyewitnesses who said that Mr. Scalabro was the only person at this confrontation who had a weapon. He had picked up a metal jack handle that was about three and a half feet long and weighed about five and a half pounds. He was the only one that was armed during the conflict. He was also way older and possibly under the influence and a lot smaller. And so it's not an implausible theory, it seems to me. Well, it's not implausible, but the overwhelming evidence was that nobody made a threatening move toward him. Nobody ‑‑ He had some evidence that they cut him off or essentially advancing on him. I mean, he said stop coming and they didn't. Well, I think that was his version. But the other witnesses said that he had followed them out to the gate, the people that he was arguing with. He followed them out to the gate as they were about to leave the property. And, again, he was armed with this heavy metal jack handle. And there's also testimony that he had to take a few steps toward the victim before he swung two hands over his head. That kind of eyewitness testimony would have been very difficult for him to overcome with a self‑serving statement on the stand that I was acting out of fear because it just wouldn't have added up. The jury wouldn't have believed it. And, in fact, the jury in the first trial, there's no reason to believe that they bought that theory either based on the note that they provided to the court. What would he have to have proved in order to establish imperfect self‑defense? In perfect self‑defense, he would have to show an actual but unreasonable belief that he was about to be harmed or his life was in serious danger. Counsel conceded that his actions were unreasonable. And then he would have to show that what he did was, even though it was unreasonable, he subjectively actually thought that his life was in danger. And based on the circumstances, it's hard to see how he could show that because there was nothing that would have prompted him to act in such a manner based on the actions of the other people. There was just a verbal argument. And by all accounts, he was about as loud and belligerent as any of them there. And as far as him being surrounded by two guys who were six foot six or six seven, one of those persons ‑‑ You say as belligerent as any of them there. You're indicating that they were belligerent. Well, there was ‑‑ yes, Your Honor. It was clear that there was a heated ‑‑ He could have feared that. Well, to the extent that he feared that they were taunting him, I don't know that he would have ‑‑ that would have struck fear into his heart. It was provoking. The evidence was more that they were taunting him by saying, come on, old man, you're an old man, you don't have the guts to do this, old man. It wasn't like we're going to hit you. Old man was 44 years old, right? Well, but I guess to a 20‑year‑old, that's an old man. What he said. But I don't think that his statement, which would not have been supported by any of the other witnesses there, would have been sufficient to persuade a jury that he acted in self ‑‑ in the belief that he was about to be hurt. How about the witness that your opponent says should have been called and wasn't? The six foot seven, Otto Biggs? Well, he was initially called as a prosecution witness in the first trial. And the prosecutor ‑‑ I'm sorry, I correct myself. He was called as a defense witness in the first trial. And the prosecutor in the second trial apparently thought that his testimony was more helpful to the prosecution than the defense, and so the prosecutor introduced his testimony by way of stipulation in the retrial. I think that's a sign that this testimony was not going to be very helpful for the defense. But their argument is that it wasn't the testimony, it was the guy, essentially. Pardon me? The argument is that it wasn't the testimony, it was the guy. The fact that he was, in fact, a large and somewhat intimidating person, they think. But that's ‑‑ I don't understand that argument, because all the other witnesses said that this six foot seven guy was the one of the bunch that the defendant recognized and felt comfortable with. In fact, the evidence was that the defendant had picked up this pipe initially, or this jack handle, and was approaching the group and then saw the six foot seven guy, Mr. Biggs, come out, and he recognized him and then he put the pipe down temporarily because he was assured by Mr. Biggs that everything's under control, there's no need to get out of line here. And so I don't ‑‑ to me it doesn't make sense, the theory that Mr. Biggs was one of the people who was threatening him. It was clear that the taunts and the yelling were between Mr. Toe, the victim, and another person, I think his first name, David, Mr. Green. Those were the two that he was involved in this shouting match with that ultimately ended in him striking one of them with this pipe. Unless there's any other questions, I'll be happy to submit it. Thank you for your attention. Add or submit it. Oh, I'm sorry. I'm sorry. That's right. I'm sorry. It's just been a long, long week. It's been a long week. I really will only take one minute. Just to repeat some stuff. Tactical decisions, we heard a lot of the words about tactical decisions, and again, it's based on assumption. We don't know what Mr. Schweitzer actually did or why he did it because no one's talked to him in any state proceedings. The jury note, I would urge you, and it's an excerpt of Record 151, that you read the entire jury note because the last portion that ‑‑ I'm just reading it. Go ahead. Well, the point I want to make is that the last portion, that some jurors contended the defendant acted in the heat of passion and provoked response without deliberate knowledge that the floor pipe could kill. I mean, you always have some jurors who come up with cockamamie ideas, and you have to look at that. But again, we don't know what, why, or how Mr. Schweitzer assessed this jury note because no one's talked to him about it, and we don't have any factual development. But what I was going to say, it's inherently a fact. I mean, it couldn't have been negligence or anything like that. I mean, here's a situation where we know he had the information, so it's not an investigation problem because the information is what happened at the first trial. And we know that he didn't just accidentally not put him on the stand. He had to make a decision one way or another. It's not like failing to object or something like that. So it's necessarily a tactical decision. It is a tactical decision, but whether it was reasonable or not is really part of the question. Because I make a tactical decision doesn't mean that I'm immune from being questioned later on about whether that was a reasonable decision. Given what we know about Mr. Scadabo's testimony from the first trial, which amplifies and explains the interview statement and makes it very clear that this was about his fear, and this segues back to his ---- There are obviously downsides to getting him on the stand. There certainly are. A, to be cross-examined with his priors, and B, we don't know, but whatever impression he made. Right. What we do know, one of the things we do know is that the respondents would have us believe that Mr. Scadabo is inherently uncredible. Well, he was charged with first degree murder the first time. The jury believed him to the degree that they believed he did not deliver. You know it unanimously agreed because they acquitted him. They didn't hang on first. It doesn't sound like there was a coherent first amendment theory at all. I don't think it was, but lots of times people get convicted of those things because there's some evidence of it, and that happens. So the juror believed him to some degree at the first trial. We know that. The State urges us to ignore Audemar Biggs' testimony and his presence, not just his size, but also his testimony that corroborates Scadabo being surrounded in some way, that David Green is distracting him to the right, and then he sees movement and hits tough. And I know I should be quiet. So thank you. Thank you. We appreciate the arguments in this case, and the matter now is submitted.
judges: Hug, Paez, Berzon